Below is an Opinion of the Court.

*Randall L. Dunn*
RANDALL L. DUNN
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| In Re: | ) | Bankruptcy Case |
| | ) | No. 09-38599-rld7 |
| DAVID LISTON CULPEPPER | ) | |
| LINDA MARIE CULPEPPER, | ) | |
| | ) | MEMORANDUM OPINION |
| Debtors. | ) | |

On October 5, 2012, I received evidence and heard testimony and argument at the hearing ("Hearing") on debtor Linda Marie Culpepper's ("Ms. Culpepper") Motion for Order of Contempt ("Contempt Motion") against Wells Fargo Bank, N.A. ("Wells Fargo"), and Wells Fargo's related motion for summary judgment ("Summary Judgment Motion").[1] At the conclusion of the Hearing, I took the matters under advisement.

In deciding the matters before me, I have considered carefully the testimony presented and the exhibits admitted at the hearing, as well as arguments presented, both in legal memoranda and orally. I further

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

Page 1 - MEMORANDUM OPINION

have taken judicial notice of the docket and documents filed in Ms. Culpepper's main chapter 7 case, Case No. 09-38599-rld7 ("Main Case"), for the purpose of confirming and ascertaining facts not reasonably in dispute. Federal Rule of Evidence 201; <u>In re Butts</u>, 350 B.R. 12, 14 n.1 (Bankr. E.D. Pa. 2006). In addition, I have reviewed relevant legal authorities, both as cited to me by the parties and as located through my own research.

In light of that consideration and review, this Memorandum Opinion sets forth the court's findings of fact and conclusions of law under Civil Rule 52(a), applicable with respect to this contested matter under Rules 7052 and 9014.

<u>Factual Background</u>

"What we've got here is failure to communicate." Spoken by Strother Martin as Captain, Road Prison 36 in the movie <u>Cool Hand Luke</u>.

Ms. Culpepper filed the Contempt Motion seeking declaratory and injunctive relief; damages; sanctions; and attorneys fees for Wells Fargo's alleged violations of the injunction against efforts to collect discharged debts in § 524(a)(2). The subject debt was Ms. Culpepper's obligation to pay a promissory note ("Note"), dated September 20, 2005, in the original principal amount of $448,000 and secured by a deed of trust ("Trust Deed") on Ms. Culpepper's residence property ("Residence Property") in Bend, Oregon. <u>See</u> Exhibits A and B. The Note identified the Lender as World Savings Bank, FSB ("World Savings Bank"). Through a series of transactions, the details of which are not relevant to resolution of the matters before me, World Savings Bank has been

Page 2 - MEMORANDUM OPINION

1  integrated into Wells Fargo.[2]

2          Contrary to my assumptions going into the Hearing, the loan
3  ("Loan") documented by the Note was originated as a "portfolio loan."
4  That is, the Loan was made by World Savings Bank for its own account with
5  the intent that it would be retained in its loan portfolio rather than
6  being securitized and sold in the secondary investment market.
7  Accordingly, the Note was never sold or assigned.  Mr. Michael Dolan, a
8  litigation support manager for Wells Fargo who worked for World Savings
9  Bank from 1984 until 2007, when its name was changed to Wachovia,
10 testified that the Loan was made to combine and refinance a first trust
11 deed home finance loan and a home equity loan that Ms. Culpepper had
12 borrowed from World Savings Bank.  Mr. Dolan further testified that at
13 the time the Loan was made, Ms. Culpepper had always paid her obligations
14 to World Savings Bank on time and had an exceptionally good FICO score.

15         Unfortunately, due to economic reverses resulting from the
16 recession and health issues impacting her husband,[3] hard times ensued for
17 Ms. Culpepper.  At some point, Ms. Culpepper ceased making payments on
18 the Note obligation, and on October 19, 2009, she filed a petition for
19 relief under chapter 7.

20         In her schedules, Ms. Culpepper valued the Residence Property
21 at $300,000 on the date of her bankruptcy filing and stated that she owed

---

23     [2] References to "Wells Fargo" herein include "Wachovia" and
24 "Wachovia Mortgage" to the extent those names are relevant to
communications received or initiated by Ms. Culpepper after her
25 bankruptcy filing.

26     [3] Mr. Culpepper experienced kidney failure and ultimately had a
kidney transplant, from which he has recovered.

Page 3 - MEMORANDUM OPINION

$496,508 on the secured Note. See Exhibit C. Her schedules reflected a substantial decrease in income. See Schedule I and Statement of Financial Affairs, Item 1, Main Case Docket No. 1. In her Statement of Intention(s) ("Statement of Intent"), Ms. Culpepper indicated that she intended to surrender the Residence Property. See Main Case Docket No. 1. Mr. Dolan testified that Wells Fargo has written down and taken a loss on the Loan since Ms. Culpepper's bankruptcy filing.

However, at about the time of her bankruptcy filing, Ms. Culpepper apparently applied for approval of a modification ("First Modification Application") of the Loan. See Exhibit D. No evidence was submitted at the Hearing as to the disposition of the First Modification Application, but apparently, it was not approved and implemented. Ms. Culpepper's counsel provided her with a letter authorizing direct contact to her regarding any proposal "to modify/refinance [her] home mortgage" dated January 10, 2010. See Exhibit 2.

Ms. Culpepper received her chapter 7 discharge by order entered on February 19, 2010. See Exhibit E. Wells Fargo learned of her discharge on February 23, 2010. See Exhibit 21, p.31, at lines 20-23. Her bankruptcy case was closed by order entered on July 2, 2010. See Main Case Docket No. 28.

In the meantime, in May 2010, Ms. Culpepper applied for approval of a modification ("Second Modification Application") of the Loan under the HAMP program. See Exhibit F. The Second Modification Application was approved (see Exhibit G), but because she determined that she could not afford the modified Loan payments, and the HAMP modification did not provide for any principal reduction of the Loan,

Ms. Culpepper did not move forward with the approved Loan modification. Wells Fargo acknowledged that Ms. Culpepper did not want to proceed with a HAMP modification of the Loan on July 12, 2010. See Exhibit 16.

Ms. Culpepper made one final application for a modification ("Third Modification Application") of the Loan in August 2010. See Exhibit H. No evidence was submitted at the Hearing as to the disposition of the Third Loan Modification, but apparently, it was not approved and implemented. By the end of 2010, Ms. Culpepper and her husband had been locked out of the Residence Property. See Exhibit 4.

In January 2011, Ms. Culpepper began receiving a series of telephone calls from Wells Fargo. The precise number of calls is not clear, but she received calls most days, sometimes twice a day, until they finally ceased in January 2012, after the Contempt Motion was filed. Mr. Dolan testified at his deposition that he believed "over a hundred" calls were made to Ms. Culpepper after the Loan modification process stopped. See Exhibit 21, p.18, at lines 23-25. Ms. Culpepper did not pick up most of the calls, but she knew that Wells Fargo was making the calls because they were reflected on her "caller ID."

Transcripts of a return call that Ms. Culpepper made to Wells Fargo and three other calls that she took (collectively, the "Transcribed Calls") were admitted as exhibits. See Exhibits 8, 9, 10 and 12. I listened to recordings of the four Transcribed Calls during the Hearing. (A "CD" of the Transcribed Calls was admitted as Exhibit P.) While the representatives of Wells Fargo in the Transcribed Calls generally advised Ms. Culpepper that they might be "attempting to collect a debt," they also stated that if the debt had been discharged in bankruptcy, they were

Page 5 - MEMORANDUM OPINION

only advising as to rights against the Residence Property.  <u>See</u> Exhibit
8, p.4; Exhibit 9, p.1; Exhibit 12, p.1.  The substance of the message
from Wells Fargo's representatives to Ms. Culpepper in the Transcribed
Calls was that the Residence Property was in foreclosure, and were there
other options Ms. Culpepper would like to discuss?  <u>See</u> Exhibit 8, p.2;
Exhibit 9, p.1; Exhibit 10, pp.1-3; Exhibit 12, pp.1-3.

      Mr. Dolan testified that the repeated telephone calls that
Ms. Culpepper was receiving were part of a program developed by Wells
Fargo to respond to concerns by the federal Office of the Comptroller of
the Currency ("OCC") that too many foreclosures were occurring and a
specific directive from the OCC to larger banks to keep borrowers
informed as to the status of foreclosure proceedings and available
alternatives.  Available alternatives included loan modifications, "short
sales," granting deeds in lieu of foreclosure or accepting cash in
exchange for consenting to foreclosure ("cash for keys").  Although all
four Wells Fargo representatives in the Transcribed Calls were
knowledgeable, professional and courteous in their communications to
Ms. Culpepper, none of them offered her any of the possible alternatives
to foreclosure.  In fact, "Rene" advised Ms. Culpepper that she did not
qualify for a loan modification.  <u>See</u> Exhibit 9, p.1.

      During each Transcribed Call, Ms. Culpepper tried to be
understanding with each of Wells Fargo's representatives, but she clearly
was frustrated and anguished by the continuing telephone calls to her.
She advised Wells Fargo's representatives that she considered their calls
to be harassing (<u>see</u> Exhibit 8, p.3; Exhibit 10, p.4; Exhibit 12, p.4),
and she wanted the calls to stop.  <u>See</u> Exhibit 8, pp.2-3; Exhibit 9,

Page 6 - MEMORANDUM OPINION

pp.4-6; Exhibit 10, pp.2, 4-8; and Exhibit 12, pp.2-5.  In the first
Transcribed Call, the following exchange took place between Ms. Culpepper
and Wells Fargo's representative, "Laudio:"

> LAUDIO: "If you would like phone calls to stop you can
> send that in writing otherwise the phone calls are
> going to continue."

> MS. CULPEPPER: "I'm not sending anything in, I tried
> writing, writing does not work either with you guys."

> LAUDIO: "Unless it is in writing, phone calls will
> continue."

Exhibit 8, p.2.

In the three subsequent Transcribed Calls, the message from
Wells Fargo was the same: If Ms. Culpepper wanted the continuing calls to
terminate, she would need to communicate to Wells Fargo in writing.  On
November 30, 2011, "Armando" advised Ms. Culpepper that she should write
and send a "cease & desist" letter, and on December 6, 2011, "CJ" did the
same.  See Exhibit 10, pp.2-3, 6-8; Exhibit 12, p.5.  In fact, Armando
provided Ms. Culpepper with a fax number ("Fax Number") to which she
could send the cease & desist letter.  See Exhibit 10, p.8.
Unfortunately, from the record presented, there is no evidence that
Ms. Culpepper or her counsel ever sent a "cease & desist" letter to the
Fax Number.

However, on November 30, 2011, Ms. Culpepper's counsel sent a
letter ("Stop Calling Letter"), with a copy of Ms. Culpepper's bankruptcy
discharge order enclosed, to three different Wells Fargo addresses
demanding that "harassment and collection" calls stop and advising that
if communications did not stop, counsel would advise the Culpeppers to
move to reopen their bankruptcy case and further move for the imposition

of contempt sanctions.  <u>See</u> Exhibit 20.  The Stop Calling Letter was not
sent to the address specified for notice to the lender in the Note and
Trust Deed.  <u>See</u> Exhibit A, pp.2,4; Exhibit B, pp.1, 11, 13.
Thereafter, the Wells Fargo calls to Ms. Culpepper continued and in fact,
did not terminate until after the Contempt Motion was filed, in January
2012.

     The Culpeppers filed a motion to reopen their bankruptcy case
on December 9, 2011, and their motion was granted by order entered on
December 16, 2011.  Main Case Docket Nos. 29 and 31.  The Culpeppers
filed the Contempt Motion on that same day, December 16, 2011.[4]

     In the Contempt Motion, Ms. Culpepper requested actual damages
of $20,000.  The evidence presented at the Hearing indicated that
Ms. Culpepper was subjected to considerable stress just from seeing the
repeated notices on her caller ID that Wells Fargo was calling during
2011 and early 2012 (<u>see, e.g.</u>, Exhibit R, pp.2-4).  The pressure and
stress she was feeling were clearly evident from her communications to
Wells Fargo's representatives documented in the Transcribed Calls and
could be heard when the "CD" of the Transcribed Calls was played during
the Hearing.  James Boehnlein, a professor of psychiatry at Oregon Health
Sciences University who interviewed Ms. Culpepper, testified that in his
opinion, Ms. Culpepper exhibited symptoms of moderate to severe
depression and anxiety resulting from her communications with Wells
Fargo.  He also opined that her "adjustment disorder" was discrete rather

---

[4] The Contempt Motion originally was filed in the names of both Mr.
and Ms. Culpepper, but Mr. Culpepper later was withdrawn from the
Contempt Motion because he did not sign the Note and had no personal
obligation under the Loan.  <u>See</u> Main Case Docket No. 64.

Page 8 - MEMORANDUM OPINION

than chronic and that her emotional distress was easily treated. However, he further testified that her stress was continuing as a result of the unresolved litigation with Wells Fargo. Following her interview, Ms. Culpepper did not initiate a program of treatment for her emotional distress with Professor Boehnlein. Ms. Culpepper testified that she had not sought medical treatment for her stress. The amount of her actual damages was not quantified in the evidence presented.

The evidence submitted at the Hearing also indicated that Ms. Culpepper was subject to considerable stress and suffered depression at times from 2006 forward as a result of her husband's health issues resulting from his kidney failure and kidney transplant, and the financial/economic problems that culminated in her bankruptcy filing and continued thereafter. See, e.g., Exhibit R, pp.1-2.

The court scheduled a status hearing on the Contempt Motion for January 27, 2012. At the status hearing, the court determined that it was appropriate to issue an Order to Show Cause ("Show Cause Order") and scheduled an evidentiary hearing to cover liability and damages issues for March 30, 2012. See Main Case Docket No. 41. The Order to Show Cause was issued on February 2, 2012. Main Case Docket No. 47. Thereafter, the evidentiary hearing was continued several times to allow the parties to conduct discovery and engage in settlement discussions. However, the matter was not settled, and in granting the third motion for a continuance, the court scheduled the Hearing for October 5, 2012. See Main Case Docket Nos. 72 and 74.

Wells Fargo filed the Summary Judgment Motion and supporting documents on August 23, 2012. See Main Case Docket Nos. 77-80. At a

Page 9 - MEMORANDUM OPINION

further status hearing on August 28, 2012, the court granted Wells Fargo's motion to allow filing of the Summary Judgment Motion but advised the parties that, other than allowing Ms. Culpepper to file her response to the Summary Judgment Motion in conjunction with, or as part of, her Hearing memorandum and allowing Wells Fargo to file any reply on September 28, 2012, the Final Scheduling Order entered on July 19, 2012, would remain in place, and the Hearing would proceed on October 5, 2012. <u>See</u> Main Case Docket Nos. 83 and 84. Thereafter, the Hearing proceeded as scheduled on October 5, 2012, and following the presentation of evidence and argument, I took the matters under advisement. <u>See</u> Main Case Docket No. 91.

<u>Jurisdiction</u>

I have jurisdiction to decide the Contempt Motion and the Summary Judgment Motion under 28 U.S.C. §§ 1334, 157(b)(1) and 157(b)(2)(O).

<u>Discussion</u>

A. <u>Summary judgment standards</u>

Under Civil Rule 56(a), applicable under Rule 7056, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment should not be entered when there are disputes over facts that may affect the outcome of the dispute under governing law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

B. <u>Alleged violations of the discharge injunction</u>

The question to be decided is whether Wells Fargo violated the

Page 10 - MEMORANDUM OPINION

discharge injunction provided for in § 524(a)(2) by repeatedly calling

Ms. Culpepper throughout 2011 and into 2012, long after her chapter 7

discharge had been entered and she and her husband had been locked out of

the Residence Property.  Section 524(a)(2) provides that,

> A discharge in a case under this title – (2) operates
> as an injunction against the commencement or
> continuation of an action, the employment of process,
> or an act to collect, recover or offset any such debt
> as a personal liability of the debtor, whether or not
> discharge of such debt is waived . . . .

"The discharge injunction survives the bankruptcy case and applies

permanently with respect to every debt that is discharged."  Garske v.

Arcadia Financ., Ltd. (In re Garske), 287 B.R. 537, 542 (9th Cir. BAP

2002).

        Procedurally, an alleged violation of the discharge injunction

is pursued by a motion invoking the contempt remedies allowed for in

§ 105(a).  See Walls v. Wells Fargo Bank, N.A., 276 F.3d 502, 509-10 (9th

Cir. 2002).  In order to be subject to sanctions for violating the

discharge injunction, a party's violation must be "willful."  The Ninth

Circuit has adopted a two-part test to determine whether the willfulness

standard has been met: 1) Did the alleged violating party know that the

discharge injunction applied?  2) Did such party intend the actions that

violated the discharge injunction?  See Zilog, Inc. v. Corning (In re

Zilog, Inc.), 450 F.3d 996, 1007 (9th Cir. 2006); Renwick v. Bennett, 298

F.3d 1059, 1069 (9th Cir. 2002).  The burden of proof for the moving

party is clear and convincing evidence.  See In re Zilog, Inc., 450 F.3d

at 1007; Renwick v. Bennett, 298 F.3d at 1069 ("The moving party has the

burden of showing by clear and convincing evidence that the contemnors

violated a specific and definite order of the court."). "[W]here the creditor holds a secured interest in property subject to a scheduled debt, a discharge extinguishes only the personal liability of the debtor," and the creditor can pursue recovery of the debt by realizing on its collateral. <u>In re Garske</u>, 287 B.R. at 542.

C. <u>Summary Judgment is not appropriate</u>

Wells Fargo has moved for summary judgment on the Contempt Motion, arguing that as a matter of law, it cannot be liable for violating Ms. Culpepper's discharge injunction where the evidence is undisputed that Wells Fargo representatives never demanded payment of the Loan from Ms. Culpepper during postdischarge telephone calls. Wells Fargo further argues that since Wells Fargo retained its lien interest in the Residence Property, it was entirely appropriate for Wells Fargo to communicate to Ms. Culpepper as to the status of foreclosure and to discuss her potential interest in avoiding foreclosure by means of a possible loan modification. However, based on the record from the Hearing, there are genuine issues of material fact as to the purpose and effects of the postdischarge telephone calls to Ms. Culpepper starting in 2011, based on the facts that by that time, after three fruitless attempts to obtain a Loan modification that she could work with, Ms. Culpepper had ceased applying for a Loan modification and had been locked out of the Residence Property. In fact, in one of the Transcribed Calls (<u>see</u> Exhibit 9, p.1), Ms. Culpepper was informed that she did not qualify for a Loan modification. In these circumstances, granting summary judgment in favor of Wells Fargo is not consistent with the requirements of Civil Rule 56(a), and I will enter an order denying the

Page 12 - MEMORANDUM OPINION

1   Summary Judgment Motion.

2   D.  <u>Resolving the Contempt Motion based on the evidence</u>

3           The legislative history of § 524(a)(2) makes clear that the

4   discharge injunction is intended to be very broad in its application:

> Subsection (a) specifies that a discharge in a
> bankruptcy case voids any judgment to the extent that
> it is a determination of the personal liability of the
> debtor with respect to a prepetition debt, and
> operates as an injunction against the commencement or
> continuation of an action, the employment of process,
> or any act, including telephone calls, letters, and
> personal contacts, to collect, recover, or offset any
> discharged debt as a personal liability of the debtor,
> or from property of the debtor, whether or not the
> debtor has waived discharge of the debt involved.  The
> injunction is to give complete effect to the discharge
> and to eliminate any doubt concerning the effect of
> the discharge as a total prohibition on debt
> collection efforts.  This paragraph has been expanded
> over a comparable provision in Bankruptcy Act § 14f to
> cover any act to collect, such as dunning by telephone
> or letter, or indirectly through friends, relatives,
> or employers, harassment, threats of repossession, and
> the like.  The change is consonant with the new policy
> forbidding binding reaffirmation agreements under
> proposed 11 U.S.C. 524(d), and is intended to insure
> that once a debt is discharged, the debtor will not be
> pressured in any way to repay it.  In effect, the
> discharge extinguishes the debt, and creditors may not
> attempt to avoid that. . . .

19  H. Rept No. 95-595 to accompany H.R. 8200, 95th Cong., 1st Sess. (1977),

20  at pp.365-66.  "Section 524(a)(2) provides for a broad injunction against

21  not only legal proceedings, but also any other acts to collect a

22  discharged debt as a personal liability of the debtor . . . It extends to

23  all forms of collection activity, including letters, phone calls, threats

24  of criminal proceedings or other adverse actions intended to bring about

25  repayment. . . . In enforcing the injunction, courts have encountered a

26  wide variety of methods used by creditors to attempt to collect

Page 13 - MEMORANDUM OPINION

discharged debts."   4 <u>Collier on Bankruptcy</u> ¶ 524.02[2] (Alan N. Resnick

& Henry J. Sommer eds., 16th ed. 2012) ("<u>Collier on Bankruptcy</u>").   "When

a secured creditor retains a lien on the debtor's property after the

discharge, courts have held that it is not <u>per se</u> improper for the

secured creditor to contact a debtor to send payment coupons, determine

whether payments will be made on the secured debt, or inform the debtor

of a possible foreclosure or repossession, as long as it is clear the

creditor is not attempting to collect the debt as a personal liability."

4 <u>Collier on Bankruptcy</u> ¶ 524.02[2][b].

        Because of the variety of situations in which alleged

violations of the discharge injunction can arise, such cases are very

fact dependent.   In that regard, this case is no exception.

        When Ms. Culpepper filed her bankruptcy case, she declared in

her Statement of Intent that she intended to surrender the Residence

Property.   If she had held to that intent, we probably would not be here.

Yet, virtually in conjunction with her bankruptcy filing, Ms. Culpepper

initiated efforts to obtain a modification of the Loan and retain the

Residence Property.   In fact, she filed three different applications with

Wells Fargo in attempts to obtain a Loan modification, twice after her

discharge had been entered.   In so doing, she opened the door to further

communications with Wells Fargo.   However, by the end of 2010, her

efforts seeking to obtain a modification of the Loan had ceased, and she

and her husband had been locked out of the Residence Property.

        Thereafter, Ms. Culpepper received over a hundred calls from

Wells Fargo.   Unlike the court in <u>Henry v. Assoc. Home Equity Serv., Inc.</u>

<u>(In re Henry)</u>, 266 B.R. 457, 470 (Bankr. C.D. Cal. 2001), I am not

prepared to find that "[the volume of telephone calls alone compels a finding that [the concerned mortgage lien creditor] was harassing the debtors in violation of the . . . discharge injunction." However, I do find the history and volume of calls to be relevant to deciding the Contempt Motion. In particular, I find that the evidence provided by the Transcribed Calls is critical.

Mr. Dolan testified that the calls Ms. Culpepper received were part of Wells Fargo's program to advise its customers facing foreclosure as to the status of foreclosure proceedings and offer them the opportunity to discuss available alternatives. So far, so good. But what "alternatives to foreclosure" actually were available to Ms. Culpepper? There is no evidence in the record that Wells Fargo considered a "short sale" of the Residence Property or that a "short sale" option was available to Ms. Culpepper. If a Wells Fargo representative had advised Ms. Culpepper that the calls would stop if she would sign a deed in lieu of foreclosure for the Residence Property, based on the evidence presented at the Hearing, I find that Ms. Culpepper would have accepted that offer. No such offer was made to her. She would have been even more willing to accept a "cash for keys" offer, but again, no such offer was made to her. Ultimately, based on the evidence presented, I find that the only alternative to foreclosure that Wells Fargo wanted to discuss with Ms. Culpepper was a further attempt(s) to obtain a modification of the Loan. If Ms. Culpepper entered into a Loan modification agreement with Wells Fargo, its effect would be to revive all, or at least a portion, of her discharged debt to the bank.

The Transcribed Calls are important for a number of reasons:

Page 15 - MEMORANDUM OPINION

First, they establish that the Wells Fargo representatives with whom
Ms. Culpepper spoke (Laudio, Rene, Armando and CJ) were all
knowledgeable, intelligent and professional.  They were not
"robocallers," with neither the authority nor the capacity to do anything
other than speak the words of Wells Fargo's "mini-Miranda" script.  In
fact, Armando advised Ms. Culpepper that he was a specialist in
foreclosure and bankruptcy.  See Exhibit 10, pp.2-3.  I note that Armando
also stated initially that "the purpose of this call is to give you a
status of your loan modification."  See id. at p.1.  (Previously, Rene
had advised Ms. Culpepper that she did not qualify for a loan
modification, for which she previously had applied.  See Exhibit 9, p.1.)
I find that there had to be a purpose to the calls other than to recite
mindlessly to Ms. Culpepper that the Loan was in active foreclosure but
that no foreclosure sale date had yet been scheduled.  I further find
that the purpose of the calls was to engage her in discussion about the
process for modifying the Loan with the objective of encouraging her to
make a further Loan modification application.

        Second, in each of the Transcribed Calls, Ms. Culpepper clearly
advised Wells Fargo's representatives that she was not interested in
pursuing a Loan modification, and she wanted the calls to stop.  Her
anguish and frustration during the Transcribed Calls were palpable.

        Third, in response, Wells Fargo's representatives told
Ms. Culpepper that if she wanted the calls to stop, she needed to send a
written request.  Laudio advised Ms. Culpepper that if she wanted the
calls to stop, she would need to make that request in writing.  See
Exhibit 8, p.4.  Rene "noted here that you specified during the

Page 16 - MEMORANDUM OPINION

conversation that you don't want us to call you any more" (see Exhibit 9, p.6), but he could not guarantee that calls would not continue. Armando advised Ms. Culpepper that if she wanted the calls to end, she would need to send a "cease & desist" letter, and he provided her with the Fax Number. See Exhibit 10, pp. 2, 8. Finally, C.J. advised Ms. Culpepper that if she wanted the calls to stop, she would need to send a letter to that effect, and "we will take you out of the auto-dialing system." See Exhibit 12, p. 5.

Arguably, in the greatest "Series of Unfortunate Events" since Lemony Snicket, apparently neither Ms. Culpepper nor her counsel sent a cease and desist letter to the Fax Number. Her counsel did send a cease and desist letter to three different Wells Fargo addresses on November 30, 2011, but he did not send it to the notice address specified in the Note and Trust Deed. However, since Ms. Culpepper's personal obligations under the Note and Trust Deed had been discharged in her bankruptcy, I find it difficult to fault her counsel for not using that World Savings Bank address over two years after her bankruptcy filing. Wells Fargo did receive counsel's cease and desist letter no later than early December 2011. See Exhibit 14, pp.2-6. Yet, the calls did not finally stop until after the Contempt Motion was filed, over a month later.

In these circumstances, I find that Wells Fargo knew that the discharge injunction applied with respect to Ms. Culpepper, and I find that Wells Fargo intended to continue to route calls to Ms. Culpepper in an effort to reinstate all of some of a discharged debt, i.e., the Loan, through a loan modification, after Ms. Culpepper had clearly advised knowledgeable, thinking Wells Fargo employees that she was not interested

Page 17 - MEMORANDUM OPINION

in pursuing a modification of the Loan with Wells Fargo and wanted the calls to stop. Accordingly, I conclude that Ms. Culpepper has established by clear and convincing evidence that Wells Fargo violated the discharge injunction under § 524(a)(2).

The question then moves to an appropriate measure of damages. As I indicated in my tentative conclusions communicated at the Hearing, I do not find this case appropriate for the imposition of punitive damages. Ms. Culpepper opened the door to communications with Wells Fargo postpetition and postdischarge through her pursuit of multiple applications to modify the Loan. The specific communications from Wells Fargo representatives consistently and overtly disclaimed any attempt to collect a discharged debt from Ms. Culpepper. If the communications had not persisted in the face of repeated, anguished communications from Ms. Culpepper requesting that the calls stop, the decision could have been different.

However, the calls did not stop, and there is a fundamental problem with a program of calls where intelligent, knowledgeable Wells Fargo employees cannot take the responsibility to cause such calls to stop in the face of clear communications from a former customer that she has no interest in further pursuing a loan modification and wants such calls to cease. An award of actual damages is appropriate, but the measure of such damages is problematic based on the record before me. In a published decision, by which I am bound, In re Feldmeier, 335 B.R. 807 (Bank. D. Or. 2005), Judge Brown determined that it was appropriate to award emotional distress damages as compensatory damages for willful violations of the discharge injunction. Id. at 812-14. In this case,

Page 18 - MEMORANDUM OPINION

Ms. Culpepper has testified and submitted evidence establishing that she suffered considerably from stress and depression as a result, at least in part, from the continuing calls from Wells Fargo in 2011 continuing into early 2012. Professor Boehnlein gave his opinion after interviewing Ms. Culpepper that the Wells Fargo calls produced a condition of moderate to severe depression that was discrete rather than chronic and could be treated. Ms. Culpepper testified that she had not sought treatment for those effects. In these circumstances, I find it appropriate to award Ms. Culpepper $4,000 in emotional distress damages, $1,000 for each of the Transcribed Calls during which she clearly confirmed to Wells Fargo's representatives that she had no interest in pursuing a Loan modification and advised in no uncertain terms that she wanted the persistent calls to cease.

In addition, since it took the filing and pursuit of the Contempt Motion finally to stop the calls from Wells Fargo, I conclude that it is appropriate to award Ms. Culpepper her reasonable attorneys fees and costs for prosecuting the Contempt Motion. Mr. Fuller should submit an itemization of fees and costs within twenty-one (21) days following the entry of this Memorandum Opinion. Thereafter, Wells Fargo's counsel shall have fourteen (14) days to object to the claimed fees and costs, and if such an objection is filed, I will set the matter for hearing.

Conclusion

Based on the foregoing findings of fact and conclusions of law, I am denying the Summary Judgment Motion and granting the Contempt Motion. Mr. Fuller should submit an order consistent with this

1  Memorandum Opinion within fourteen (14) days following the date of its

2  entry.

3                                    # # #

4  cc:        Michael R. Fuller, Esq.
              Robert J. Bocko, Esq.