**Robert J. Bocko, OSB No. 964831**
**Philip R. Lempriere, OSB No. 080063**
**robert.bocko@kyl.com**
**philip.lempriere@kyl.com**
KEESAL, YOUNG & LOGAN
1301 Fifth Avenue, Suite 1515
Seattle, Washington  98101
Telephone:   (206) 622-3790
Facsimile:   (206) 343-9529

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IN RE:<br><br>**DAVID AND LINDA CULPEPPER,**<br><br>Debtors. | Case No. 09-38599-rld<br>Chapter 7<br><br>**WELLS FARGO'S AMENDED**<br>**NOTICE OF APPEAL** |

Pursuant to 28 U.S.C. § 158(a), Creditor Wells Fargo Bank, N.A. ("Wells

Fargo"), appeals to the United Stated District Court the following decision and

order of Bankruptcy Judge Randall L. Dunn:  the Memorandum Opinion dated

November 5, 2012 (ECF No. 92), and the Order Holding Wells Fargo Bank, N.A. in

Contempt of Court dated November 14, 2012 (ECF No. 94).  Copies of those two

documents are attached hereto.

The names of all parties to the decision appealed from and the names,

addresses, and telephone number of their respective attorneys are as follows:

| | |
|---|---|
| **Debtors:** | David and Linda Culpepper |
| **Attorneys:** | Michael R. Fuller |
| | Rex K. Daines |
| | Olsen Olsen & Daines |
| | 9415 SE Stark, Ste 207 |
| | Portland, OR  97216 |
| | Telephone:  (503) 274-4252 |

Case No.:  09-38599-rld7
WELLS FARGO'S AMENDED NOTICE OF APPEAL - 1

KEESAL, YOUNG & LOGAN
1301 FIFTH AVENUE, SUITE 1515
SEATTLE, WASHINGTON 98101
(206) 622-3790

| | |
|---|---|
| **Creditor:** | Wells Fargo Bank, N.A. |
| **Attorneys:** | Robert J. Bocko |
| | Philip R. Lempriere |
| | Keesal, Young & Logan |
| | 1301 Fifth Ave, Ste. 1515 |
| | Seattle, WA  98101 |
| | Telephone:   (206) 622-3790 |

A separate Election to Have Appeal Heard by District Court was filed on November 19, 2012 (ECF No. 98).

This appeal to the district court is closely related to a separate action that is now pending before Judge Michael R. Hogan, Case No. 6:12-cv-00969 (Eugene Division) between the same parties and involving the same set of facts. Accordingly, Wells Fargo requests that the appeal to the district court be assigned to Judge Hogan as a related matter.

DATED this 26th day of November, 2012.

KEESAL, YOUNG & LOGAN

s/ Robert J. Bocko
Robert J. Bocko, OSB No. 964831
Philip R. Lempriere, OSB No. 080063
1301 Fifth Ave, Ste. 1515
Seattle, WA  98101
Telephone:   (206) 622-3790
Facsimile:    (206) 343-9529

Case No.:  09-38599-rld7
WELLS FARGO'S AMENDED NOTICE OF APPEAL - 2

KEESAL, YOUNG & LOGAN
1301 FIFTH AVENUE, SUITE 1515
SEATTLE, WASHINGTON 98101
(206) 622-3790

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date given below, I electronically filed the foregoing **WELLS FARGO'S AMENDED NOTICE OF APPEAL** with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to the following persons:

Michael R. Fuller
Rex K. Daines
Olsen Olsen & Daines
9415 SE Stark, Ste 207
Portland, OR  97216
Email: mfuller@olsendaines.com
          rdaines@olsendaines.com

DATED this 26th day of November, 2012, at Seattle, Washington.

Hillary Thelen

KYL_SE79778v2

Case No.:  09-38599-rld7
WELLS FARGO'S AMENDED NOTICE OF APPEAL - 3

KEESAL, YOUNG & LOGAN
1301 FIFTH AVENUE, SUITE 1515
SEATTLE, WASHINGTON 98101
(206) 622-3790

DISTRICT OF OREGON

**F I L E D**

November 05, 2012

Clerk, U.S. Bankruptcy Court

Below is an Opinion of the Court.

*Randall L. Dunn*

RANDALL L. DUNN
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| In Re: | ) | Bankruptcy Case |
| | ) | No. 09-38599-rld7 |
| DAVID LISTON CULPEPPER | ) | |
| LINDA MARIE CULPEPPER, | ) | |
| | ) | MEMORANDUM OPINION |
| Debtors. | ) | |

On October 5, 2012, I received evidence and heard testimony and argument at the hearing ("Hearing") on debtor Linda Marie Culpepper's ("Ms. Culpepper") Motion for Order of Contempt ("Contempt Motion") against Wells Fargo Bank, N.A. ("Wells Fargo"), and Wells Fargo's related motion for summary judgment ("Summary Judgment Motion").[1] At the conclusion of the Hearing, I took the matters under advisement.

In deciding the matters before me, I have considered carefully the testimony presented and the exhibits admitted at the hearing, as well as arguments presented, both in legal memoranda and orally. I further

_____

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

Page 1 - MEMORANDUM OPINION

have taken judicial notice of the docket and documents filed in Ms.
Culpepper's main chapter 7 case, Case No. 09-38599-rld7 ("Main Case"),
for the purpose of confirming and ascertaining facts not reasonably in
dispute.  Federal Rule of Evidence 201; In re Butts, 350 B.R. 12, 14 n.1
(Bankr. E.D. Pa. 2006).  In addition, I have reviewed relevant legal
authorities, both as cited to me by the parties and as located through my
own research.

In light of that consideration and review, this Memorandum
Opinion sets forth the court's findings of fact and conclusions of law
under Civil Rule 52(a), applicable with respect to this contested matter
under Rules 7052 and 9014.

Factual Background

"What we've got here is failure to communicate."  Spoken by
Strother Martin as Captain, Road Prison 36 in the movie Cool Hand Luke.

Ms. Culpepper filed the Contempt Motion seeking declaratory and
injunctive relief; damages; sanctions; and attorneys fees for Wells
Fargo's alleged violations of the injunction against efforts to collect
discharged debts in § 524(a)(2).  The subject debt was Ms. Culpepper's
obligation to pay a promissory note ("Note"), dated September 20, 2005,
in the original principal amount of $448,000 and secured by a deed of
trust ("Trust Deed") on Ms. Culpepper's residence property ("Residence
Property") in Bend, Oregon.  See Exhibits A and B.  The Note identified
the Lender as World Savings Bank, FSB ("World Savings Bank").  Through a
series of transactions, the details of which are not relevant to
resolution of the matters before me, World Savings Bank has been

Page 2 - MEMORANDUM OPINION

1    integrated into Wells Fargo.[2]

2          Contrary to my assumptions going into the Hearing, the loan

3    ("Loan") documented by the Note was originated as a "portfolio loan."

4    That is, the Loan was made by World Savings Bank for its own account with

5    the intent that it would be retained in its loan portfolio rather than

6    being securitized and sold in the secondary investment market.

7    Accordingly, the Note was never sold or assigned.  Mr. Michael Dolan, a

8    litigation support manager for Wells Fargo who worked for World Savings

9    Bank from 1984 until 2007, when its name was changed to Wachovia,

10   testified that the Loan was made to combine and refinance a first trust

11   deed home finance loan and a home equity loan that Ms. Culpepper had

12   borrowed from World Savings Bank.  Mr. Dolan further testified that at

13   the time the Loan was made, Ms. Culpepper had always paid her obligations

14   to World Savings Bank on time and had an exceptionally good FICO score.

15         Unfortunately, due to economic reverses resulting from the

16   recession and health issues impacting her husband,[3] hard times ensued for

17   Ms. Culpepper.  At some point, Ms. Culpepper ceased making payments on

18   the Note obligation, and on October 19, 2009, she filed a petition for

19   relief under chapter 7.

20         In her schedules, Ms. Culpepper valued the Residence Property

21   at $300,000 on the date of her bankruptcy filing and stated that she owed

22   _____

23         [2] References to "Wells Fargo" herein include "Wachovia" and
     "Wachovia Mortgage" to the extent those names are relevant to
24   communications received or initiated by Ms. Culpepper after her
     bankruptcy filing.
25
         [3] Mr. Culpepper experienced kidney failure and ultimately had a
26   kidney transplant, from which he has recovered.

Page 3 – MEMORANDUM OPINION

$496,508 on the secured Note.  <u>See</u> Exhibit C.  Her schedules reflected a

substantial decrease in income.  <u>See</u> Schedule I and Statement of

Financial Affairs, Item 1, Main Case Docket No. 1.  In her Statement of

Intention(s) ("Statement of Intent"), Ms. Culpepper indicated that she

intended to surrender the Residence Property.  <u>See</u> Main Case Docket

No. 1.  Mr. Dolan testified that Wells Fargo has written down and taken a

loss on the Loan since Ms. Culpepper's bankruptcy filing.

However, at about the time of her bankruptcy filing,

Ms. Culpepper apparently applied for approval of a modification ("First

Modification Application") of the Loan.  <u>See</u> Exhibit D.  No evidence was

submitted at the Hearing as to the disposition of the First Modification

Application, but apparently, it was not approved and implemented.

Ms. Culpepper's counsel provided her with a letter authorizing direct

contact to her regarding any proposal "to modify/refinance [her] home

mortgage" dated January 10, 2010.  <u>See</u> Exhibit 2.

Ms. Culpepper received her chapter 7 discharge by order entered

on February 19, 2010.  <u>See</u> Exhibit E.  Wells Fargo learned of her

discharge on February 23, 2010.  <u>See</u> Exhibit 21, p.31, at lines 20-23.

Her bankruptcy case was closed by order entered on July 2, 2010.  <u>See</u>

Main Case Docket No. 28.

In the meantime, in May 2010, Ms. Culpepper applied for

approval of a modification ("Second Modification Application") of the

Loan under the HAMP program.  <u>See</u> Exhibit F.  The Second Modification

Application was approved (<u>see</u> Exhibit G), but because she determined that

she could not afford the modified Loan payments, and the HAMP

modification did not provide for any principal reduction of the Loan,

Page 4 - MEMORANDUM OPINION

Ms. Culpepper did not move forward with the approved Loan modification. Wells Fargo acknowledged that Ms. Culpepper did not want to proceed with a HAMP modification of the Loan on July 12, 2010. See Exhibit 16.

Ms. Culpepper made one final application for a modification ("Third Modification Application") of the Loan in August 2010. See Exhibit H. No evidence was submitted at the Hearing as to the disposition of the Third Loan Modification, but apparently, it was not approved and implemented. By the end of 2010, Ms. Culpepper and her husband had been locked out of the Residence Property. See Exhibit 4.

In January 2011, Ms. Culpepper began receiving a series of telephone calls from Wells Fargo. The precise number of calls is not clear, but she received calls most days, sometimes twice a day, until they finally ceased in January 2012, after the Contempt Motion was filed. Mr. Dolan testified at his deposition that he believed "over a hundred" calls were made to Ms. Culpepper after the Loan modification process stopped. See Exhibit 21, p.18, at lines 23-25. Ms. Culpepper did not pick up most of the calls, but she knew that Wells Fargo was making the calls because they were reflected on her "caller ID."

Transcripts of a return call that Ms. Culpepper made to Wells Fargo and three other calls that she took (collectively, the "Transcribed Calls") were admitted as exhibits. See Exhibits 8, 9, 10 and 12. I listened to recordings of the four Transcribed Calls during the Hearing. (A "CD" of the Transcribed Calls was admitted as Exhibit P.) While the representatives of Wells Fargo in the Transcribed Calls generally advised Ms. Culpepper that they might be "attempting to collect a debt," they also stated that if the debt had been discharged in bankruptcy, they were

Page 5 - MEMORANDUM OPINION

only advising as to rights against the Residence Property.  <u>See</u> Exhibit
8, p.4; Exhibit 9, p.1; Exhibit 12, p.1.  The substance of the message
from Wells Fargo's representatives to Ms. Culpepper in the Transcribed
Calls was that the Residence Property was in foreclosure, and were there
other options Ms. Culpepper would like to discuss?  <u>See</u> Exhibit 8, p.2;
Exhibit 9, p.1; Exhibit 10, pp.1-3; Exhibit 12, pp.1-3.

      Mr. Dolan testified that the repeated telephone calls that
Ms. Culpepper was receiving were part of a program developed by Wells
Fargo to respond to concerns by the federal Office of the Comptroller of
the Currency ("OCC") that too many foreclosures were occurring and a
specific directive from the OCC to larger banks to keep borrowers
informed as to the status of foreclosure proceedings and available
alternatives.  Available alternatives included loan modifications, "short
sales," granting deeds in lieu of foreclosure or accepting cash in
exchange for consenting to foreclosure ("cash for keys").  Although all
four Wells Fargo representatives in the Transcribed Calls were
knowledgeable, professional and courteous in their communications to
Ms. Culpepper, none of them offered her any of the possible alternatives
to foreclosure.  In fact, "Rene" advised Ms. Culpepper that she did not
qualify for a loan modification.  <u>See</u> Exhibit 9, p.1.

      During each Transcribed Call, Ms. Culpepper tried to be
understanding with each of Wells Fargo's representatives, but she clearly
was frustrated and anguished by the continuing telephone calls to her.
She advised Wells Fargo's representatives that she considered their calls
to be harassing (<u>see</u> Exhibit 8, p.3; Exhibit 10, p.4; Exhibit 12, p.4),
and she wanted the calls to stop.  <u>See</u> Exhibit 8, pp.2-3; Exhibit 9,

Page 6 - MEMORANDUM OPINION

pp.4-6; Exhibit 10, pp.2, 4-8; and Exhibit 12, pp.2-5.  In the first

Transcribed Call, the following exchange took place between Ms. Culpepper

and Wells Fargo's representative, "Laudio:"

> LAUDIO: "If you would like phone calls to stop you can
> send that in writing otherwise the phone calls are
> going to continue."

> MS. CULPEPPER: "I'm not sending anything in, I tried
> writing, writing does not work either with you guys."

> LAUDIO: "Unless it is in writing, phone calls will
> continue."

Exhibit 8, p.2.

        In the three subsequent Transcribed Calls, the message from

Wells Fargo was the same: If Ms. Culpepper wanted the continuing calls to

terminate, she would need to communicate to Wells Fargo in writing.  On

November 30, 2011, "Armando" advised Ms. Culpepper that she should write

and send a "cease & desist" letter, and on December 6, 2011, "CJ" did the

same.  See Exhibit 10, pp.2-3, 6-8; Exhibit 12, p.5.  In fact, Armando

provided Ms. Culpepper with a fax number ("Fax Number") to which she

could send the cease & desist letter.  See Exhibit 10, p.8.

Unfortunately, from the record presented, there is no evidence that

Ms. Culpepper or her counsel ever sent a "cease & desist" letter to the

Fax Number.

        However, on November 30, 2011, Ms. Culpepper's counsel sent a

letter ("Stop Calling Letter"), with a copy of Ms. Culpepper's bankruptcy

discharge order enclosed, to three different Wells Fargo addresses

demanding that "harassment and collection" calls stop and advising that

if communications did not stop, counsel would advise the Culpeppers to

move to reopen their bankruptcy case and further move for the imposition

of contempt sanctions.  <u>See</u> Exhibit 20.  The Stop Calling Letter was not sent to the address specified for notice to the lender in the Note and Trust Deed.  <u>See</u> Exhibit A, pp.2,4; Exhibit B, pp.1, 11, 13. Thereafter, the Wells Fargo calls to Ms. Culpepper continued and in fact, did not terminate until after the Contempt Motion was filed, in January 2012.

The Culpeppers filed a motion to reopen their bankruptcy case on December 9, 2011, and their motion was granted by order entered on December 16, 2011.  Main Case Docket Nos. 29 and 31.  The Culpeppers filed the Contempt Motion on that same day, December 16, 2011.[4]

In the Contempt Motion, Ms. Culpepper requested actual damages of $20,000.  The evidence presented at the Hearing indicated that Ms. Culpepper was subjected to considerable stress just from seeing the repeated notices on her caller ID that Wells Fargo was calling during 2011 and early 2012 (<u>see, e.g.</u>, Exhibit R, pp.2-4).  The pressure and stress she was feeling were clearly evident from her communications to Wells Fargo's representatives documented in the Transcribed Calls and could be heard when the "CD" of the Transcribed Calls was played during the Hearing.  James Boehnlein, a professor of psychiatry at Oregon Health Sciences University who interviewed Ms. Culpepper, testified that in his opinion, Ms. Culpepper exhibited symptoms of moderate to severe depression and anxiety resulting from her communications with Wells Fargo.  He also opined that her "adjustment disorder" was discrete rather

---

[4] The Contempt Motion originally was filed in the names of both Mr. and Ms. Culpepper, but Mr. Culpepper later was withdrawn from the Contempt Motion because he did not sign the Note and had no personal obligation under the Loan.  <u>See</u> Main Case Docket No. 64.

Page 8 - MEMORANDUM OPINION

than chronic and that her emotional distress was easily treated.
However, he further testified that her stress was continuing as a result
of the unresolved litigation with Wells Fargo.  Following her interview,
Ms. Culpepper did not initiate a program of treatment for her emotional
distress with Professor Boehnlein.  Ms. Culpepper testified that she had
not sought medical treatment for her stress.  The amount of her actual
damages was not quantified in the evidence presented.

        The evidence submitted at the Hearing also indicated that
Ms. Culpepper was subject to considerable stress and suffered depression
at times from 2006 forward as a result of her husband's health issues
resulting from his kidney failure and kidney transplant, and the
financial/economic problems that culminated in her bankruptcy filing and
continued thereafter.  <u>See, e.g.</u>, Exhibit R, pp.1-2.

        The court scheduled a status hearing on the Contempt Motion for
January 27, 2012.  At the status hearing, the court determined that it
was appropriate to issue an Order to Show Cause ("Show Cause Order") and
scheduled an evidentiary hearing to cover liability and damages issues
for March 30, 2012.  <u>See</u> Main Case Docket No. 41.  The Order to Show
Cause was issued on February 2, 2012.  Main Case Docket No. 47.
Thereafter, the evidentiary hearing was continued several times to allow
the parties to conduct discovery and engage in settlement discussions.
However, the matter was not settled, and in granting the third motion for
a continuance, the court scheduled the Hearing for October 5, 2012.  <u>See</u>
Main Case Docket Nos. 72 and 74.

        Wells Fargo filed the Summary Judgment Motion and supporting
documents on August 23, 2012.  <u>See</u> Main Case Docket Nos. 77-80.  At a

Page 9 - MEMORANDUM OPINION

further status hearing on August 28, 2012, the court granted Wells

Fargo's motion to allow filing of the Summary Judgment Motion but advised

the parties that, other than allowing Ms. Culpepper to file her response

to the Summary Judgment Motion in conjunction with, or as part of, her

Hearing memorandum and allowing Wells Fargo to file any reply on

September 28, 2012, the Final Scheduling Order entered on July 19, 2012,

would remain in place, and the Hearing would proceed on October 5, 2012.

See Main Case Docket Nos. 83 and 84.  Thereafter, the Hearing proceeded

as scheduled on October 5, 2012, and following the presentation of

evidence and argument, I took the matters under advisement.  See Main

Case Docket No. 91.

Jurisdiction

I have jurisdiction to decide the Contempt Motion and the

Summary Judgment Motion under 28 U.S.C. §§ 1334, 157(b)(1) and

157(b)(2)(O).

Discussion

A.  Summary judgment standards

Under Civil Rule 56(a), applicable under Rule 7056, summary

judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as

a matter of law."  Summary judgment should not be entered when there are

disputes over facts that may affect the outcome of the dispute under

governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249

(1986).

B.  Alleged violations of the discharge injunction

The question to be decided is whether Wells Fargo violated the

Page 10 - MEMORANDUM OPINION

discharge injunction provided for in § 524(a)(2) by repeatedly calling

Ms. Culpepper throughout 2011 and into 2012, long after her chapter 7

discharge had been entered and she and her husband had been locked out of

the Residence Property.    Section 524(a)(2) provides that,

> A discharge in a case under this title – (2) operates
> as an injunction against the commencement or
> continuation of an action, the employment of process,
> or an act to collect, recover or offset any such debt
> as a personal liability of the debtor, whether or not
> discharge of such debt is waived . . . .

"The discharge injunction survives the bankruptcy case and applies

permanently with respect to every debt that is discharged." <u>Garske v.</u>

<u>Arcadia Financ., Ltd. (In re Garske)</u>, 287 B.R. 537, 542 (9th Cir. BAP

2002).

Procedurally, an alleged violation of the discharge injunction

is pursued by a motion invoking the contempt remedies allowed for in

§ 105(a).  <u>See</u> <u>Walls v. Wells Fargo Bank, N.A.</u>, 276 F.3d 502, 509-10 (9th

Cir. 2002).   In order to be subject to sanctions for violating the

discharge injunction, a party's violation must be "willful."   The Ninth

Circuit has adopted a two-part test to determine whether the willfulness

standard has been met: 1) Did the alleged violating party know that the

discharge injunction applied?   2) Did such party intend the actions that

violated the discharge injunction? <u>See</u> <u>Zilog, Inc. v. Corning (In re</u>

<u>Zilog, Inc.)</u>, 450 F.3d 996, 1007 (9th Cir. 2006); <u>Renwick v. Bennett</u>, 298

F.3d 1059, 1069 (9th Cir. 2002).   The burden of proof for the moving

party is clear and convincing evidence.   <u>See</u> <u>In re Zilog, Inc.</u>, 450 F.3d

at 1007; <u>Renwick v. Bennett</u>, 298 F.3d at 1069 ("The moving party has the

burden of showing by clear and convincing evidence that the contemnors

Page 11 - MEMORANDUM OPINION

violated a specific and definite order of the court."). "[W]here the
creditor holds a secured interest in property subject to a scheduled
debt, a discharge extinguishes only the personal liability of the
debtor," and the creditor can pursue recovery of the debt by realizing on
its collateral. <u>In re Garske</u>, 287 B.R. at 542.

C. <u>Summary Judgment is not appropriate</u>

        Wells Fargo has moved for summary judgment on the Contempt
Motion, arguing that as a matter of law, it cannot be liable for
violating Ms. Culpepper's discharge injunction where the evidence is
undisputed that Wells Fargo representatives never demanded payment of the
Loan from Ms. Culpepper during postdischarge telephone calls.  Wells
Fargo further argues that since Wells Fargo retained its lien interest in
the Residence Property, it was entirely appropriate for Wells Fargo to
communicate to Ms. Culpepper as to the status of foreclosure and to
discuss her potential interest in avoiding foreclosure by means of a
possible loan modification.  However, based on the record from the
Hearing, there are genuine issues of material fact as to the purpose and
effects of the postdischarge telephone calls to Ms. Culpepper starting in
2011, based on the facts that by that time, after three fruitless
attempts to obtain a Loan modification that she could work with,
Ms. Culpepper had ceased applying for a Loan modification and had been
locked out of the Residence Property.  In fact, in one of the Transcribed
Calls (<u>see</u> Exhibit 9, p.1), Ms. Culpepper was informed that she did not
qualify for a Loan modification.  In these circumstances, granting
summary judgment in favor of Wells Fargo is not consistent with the
requirements of Civil Rule 56(a), and I will enter an order denying the

Page 12 - MEMORANDUM OPINION

1    Summary Judgment Motion.

2    D.   <u>Resolving the Contempt Motion based on the evidence</u>

3         The legislative history of § 524(a)(2) makes clear that the

4    discharge injunction is intended to be very broad in its application:

5              Subsection (a) specifies that a discharge in a
               bankruptcy case voids any judgment to the extent that
6              it is a determination of the personal liability of the
               debtor with respect to a prepetition debt, and
7              operates as an injunction against the commencement or
               continuation of an action, the employment of process,
8              or any act, including telephone calls, letters, and
               personal contacts, to collect, recover, or offset any
9              discharged debt as a personal liability of the debtor,
               or from property of the debtor, whether or not the
10             debtor has waived discharge of the debt involved.  The
               injunction is to give complete effect to the discharge
11             and to eliminate any doubt concerning the effect of
               the discharge as a total prohibition on debt
12             collection efforts.  This paragraph has been expanded
               over a comparable provision in Bankruptcy Act § 14f to
13             cover any act to collect, such as dunning by telephone
               or letter, or indirectly through friends, relatives,
14             or employers, harassment, threats of repossession, and
               the like.  The change is consonant with the new policy
15             forbidding binding reaffirmation agreements under
               proposed 11 U.S.C. 524(d), and is intended to insure
16             that once a debt is discharged, the debtor will not be
               pressured in any way to repay it.  In effect, the
17             discharge extinguishes the debt, and creditors may not
               attempt to avoid that. . . .

18

19   H. Rept No. 95-595 to accompany H.R. 8200, 95th Cong., 1st Sess. (1977),

20   at pp.365-66.  "Section 524(a)(2) provides for a broad injunction against

21   not only legal proceedings, but also any other acts to collect a

22   discharged debt as a personal liability of the debtor . . . It extends to

23   all forms of collection activity, including letters, phone calls, threats

24   of criminal proceedings or other adverse actions intended to bring about

25   repayment. . . . In enforcing the injunction, courts have encountered a

26   wide variety of methods used by creditors to attempt to collect

discharged debts." 4 <u>Collier on Bankruptcy</u> ¶ 524.02[2] (Alan N. Resnick
& Henry J. Sommer eds., 16th ed. 2012) ("<u>Collier on Bankruptcy</u>"). "When
a secured creditor retains a lien on the debtor's property after the
discharge, courts have held that it is not <u>per se</u> improper for the
secured creditor to contact a debtor to send payment coupons, determine
whether payments will be made on the secured debt, or inform the debtor
of a possible foreclosure or repossession, as long as it is clear the
creditor is not attempting to collect the debt as a personal liability."
4 <u>Collier on Bankruptcy</u> ¶ 524.02[2][b].

        Because of the variety of situations in which alleged
violations of the discharge injunction can arise, such cases are very
fact dependent. In that regard, this case is no exception.

        When Ms. Culpepper filed her bankruptcy case, she declared in
her Statement of Intent that she intended to surrender the Residence
Property. If she had held to that intent, we probably would not be here.
Yet, virtually in conjunction with her bankruptcy filing, Ms. Culpepper
initiated efforts to obtain a modification of the Loan and retain the
Residence Property. In fact, she filed three different applications with
Wells Fargo in attempts to obtain a Loan modification, twice after her
discharge had been entered. In so doing, she opened the door to further
communications with Wells Fargo. However, by the end of 2010, her
efforts seeking to obtain a modification of the Loan had ceased, and she
and her husband had been locked out of the Residence Property.

        Thereafter, Ms. Culpepper received over a hundred calls from
Wells Fargo. Unlike the court in <u>Henry v. Assoc. Home Equity Serv., Inc.
(In re Henry)</u>, 266 B.R. 457, 470 (Bankr. C.D. Cal. 2001), I am not

1  prepared to find that "[the volume of telephone calls alone compels a

2  finding that [the concerned mortgage lien creditor] was harassing the

3  debtors in violation of the . . . discharge injunction."  However, I do

4  find the history and volume of calls to be relevant to deciding the

5  Contempt Motion.  In particular, I find that the evidence provided by the

6  Transcribed Calls is critical.

7          Mr. Dolan testified that the calls Ms. Culpepper received were

8  part of Wells Fargo's program to advise its customers facing foreclosure

9  as to the status of foreclosure proceedings and offer them the

10  opportunity to discuss available alternatives.  So far, so good.  But

11  what "alternatives to foreclosure" actually were available to Ms.

12  Culpepper?  There is no evidence in the record that Wells Fargo

13  considered a "short sale" of the Residence Property or that a "short

14  sale" option was available to Ms. Culpepper.  If a Wells Fargo

15  representative had advised Ms. Culpepper that the calls would stop if she

16  would sign a deed in lieu of foreclosure for the Residence Property,

17  based on the evidence presented at the Hearing, I find that Ms. Culpepper

18  would have accepted that offer.  No such offer was made to her.  She

19  would have been even more willing to accept a "cash for keys" offer, but

20  again, no such offer was made to her.  Ultimately, based on the evidence

21  presented, I find that the only alternative to foreclosure that Wells

22  Fargo wanted to discuss with Ms. Culpepper was a further attempt(s) to

23  obtain a modification of the Loan.  If Ms. Culpepper entered into a Loan

24  modification agreement with Wells Fargo, its effect would be to revive

25  all, or at least a portion, of her discharged debt to the bank.

26          The Transcribed Calls are important for a number of reasons:

1    First, they establish that the Wells Fargo representatives with whom

2    Ms. Culpepper spoke (Laudio, Rene, Armando and CJ) were all

3    knowledgeable, intelligent and professional.  They were not

4    "robocallers," with neither the authority nor the capacity to do anything

5    other than speak the words of Wells Fargo's "mini-Miranda" script.  In

6    fact, Armando advised Ms. Culpepper that he was a specialist in

7    foreclosure and bankruptcy.  <u>See</u> Exhibit 10, pp.2-3.  I note that Armando

8    also stated initially that "the purpose of this call is to give you a

9    status of your loan modification."  <u>See</u> <u>id.</u> at p.1.  (Previously, Rene

10   had advised Ms. Culpepper that she did not qualify for a loan

11   modification, for which she previously had applied.  <u>See</u> Exhibit 9, p.1.)

12   I find that there had to be a purpose to the calls other than to recite

13   mindlessly to Ms. Culpepper that the Loan was in active foreclosure but

14   that no foreclosure sale date had yet been scheduled.  I further find

15   that the purpose of the calls was to engage her in discussion about the

16   process for modifying the Loan with the objective of encouraging her to

17   make a further Loan modification application.

18        Second, in each of the Transcribed Calls, Ms. Culpepper clearly

19   advised Wells Fargo's representatives that she was not interested in

20   pursuing a Loan modification, and she wanted the calls to stop.  Her

21   anguish and frustration during the Transcribed Calls were palpable.

22        Third, in response, Wells Fargo's representatives told

23   Ms. Culpepper that if she wanted the calls to stop, she needed to send a

24   written request.  Laudio advised Ms. Culpepper that if she wanted the

25   calls to stop, she would need to make that request in writing.  <u>See</u>

26   Exhibit 8, p.4.  Rene "noted here that you specified during the

Page 16 - MEMORANDUM OPINION

conversation that you don't want us to call you any more" (<u>see</u> Exhibit 9,
p.6), but he could not guarantee that calls would not continue.  Armando
advised Ms. Culpepper that if she wanted the calls to end, she would need
to send a "cease & desist" letter, and he provided her with the Fax
Number.  <u>See</u> Exhibit 10, pp. 2, 8.  Finally, C.J. advised Ms. Culpepper
that if she wanted the calls to stop, she would need to send a letter to
that effect, and "we will take you out of the auto-dialing system."  <u>See</u>
Exhibit 12, p. 5.

        Arguably, in the greatest "Series of Unfortunate Events" since
Lemony Snicket, apparently neither Ms. Culpepper nor her counsel sent a
cease and desist letter to the Fax Number.  Her counsel did send a cease
and desist letter to three different Wells Fargo addresses on November
30, 2011, but he did not send it to the notice address specified in the
Note and Trust Deed.  However, since Ms. Culpepper's personal obligations
under the Note and Trust Deed had been discharged in her bankruptcy, I
find it difficult to fault her counsel for not using that World Savings
Bank address over two years after her bankruptcy filing.  Wells Fargo did
receive counsel's cease and desist letter no later than early December
2011.  <u>See</u> Exhibit 14, pp.2-6.  Yet, the calls did not finally stop until
after the Contempt Motion was filed, over a month later.

        In these circumstances, I find that Wells Fargo knew that the
discharge injunction applied with respect to Ms. Culpepper, and I find
that Wells Fargo intended to continue to route calls to Ms. Culpepper in
an effort to reinstate all of some of a discharged debt, i.e., the Loan,
through a loan modification, after Ms. Culpepper had clearly advised
knowledgeable, thinking Wells Fargo employees that she was not interested

1  in pursuing a modification of the Loan with Wells Fargo and wanted the

2  calls to stop.  Accordingly, I conclude that Ms. Culpepper has

3  established by clear and convincing evidence that Wells Fargo violated

4  the discharge injunction under § 524(a)(2).

5       The question then moves to an appropriate measure of damages.

6  As I indicated in my tentative conclusions communicated at the Hearing, I

7  do not find this case appropriate for the imposition of punitive damages.

8  Ms. Culpepper opened the door to communications with Wells Fargo

9  postpetition and postdischarge through her pursuit of multiple

10 applications to modify the Loan.  The specific communications from Wells

11 Fargo representatives consistently and overtly disclaimed any attempt to

12 collect a discharged debt from Ms. Culpepper.  If the communications had

13 not persisted in the face of repeated, anguished communications from

14 Ms. Culpepper requesting that the calls stop, the decision could have

15 been different.

16      However, the calls did not stop, and there is a fundamental

17 problem with a program of calls where intelligent, knowledgeable Wells

18 Fargo employees cannot take the responsibility to cause such calls to

19 stop in the face of clear communications from a former customer that she

20 has no interest in further pursuing a loan modification and wants such

21 calls to cease.  An award of actual damages is appropriate, but the

22 measure of such damages is problematic based on the record before me.  In

23 a published decision, by which I am bound, In re Feldmeier, 335 B.R. 807

24 (Bank. D. Or. 2005), Judge Brown determined that it was appropriate to

25 award emotional distress damages as compensatory damages for willful

26 violations of the discharge injunction.  Id. at 812-14.  In this case,

Page 18 - MEMORANDUM OPINION

Ms. Culpepper has testified and submitted evidence establishing that she suffered considerably from stress and depression as a result, at least in part, from the continuing calls from Wells Fargo in 2011 continuing into early 2012.  Professor Boehnlein gave his opinion after interviewing Ms. Culpepper that the Wells Fargo calls produced a condition of moderate to severe depression that was discrete rather than chronic and could be treated.  Ms. Culpepper testified that she had not sought treatment for those effects.  In these circumstances, I find it appropriate to award Ms. Culpepper $4,000 in emotional distress damages, $1,000 for each of the Transcribed Calls during which she clearly confirmed to Wells Fargo's representatives that she had no interest in pursuing a Loan modification and advised in no uncertain terms that she wanted the persistent calls to cease.

In addition, since it took the filing and pursuit of the Contempt Motion finally to stop the calls from Wells Fargo, I conclude that it is appropriate to award Ms. Culpepper her reasonable attorneys fees and costs for prosecuting the Contempt Motion.  Mr. Fuller should submit an itemization of fees and costs within twenty-one (21) days following the entry of this Memorandum Opinion.  Thereafter, Wells Fargo's counsel shall have fourteen (14) days to object to the claimed fees and costs, and if such an objection is filed, I will set the matter for hearing.

<u>Conclusion</u>

Based on the foregoing findings of fact and conclusions of law, I am denying the Summary Judgment Motion and granting the Contempt Motion.  Mr. Fuller should submit an order consistent with this

Page 19 - MEMORANDUM OPINION

Memorandum Opinion within fourteen (14) days following the date of its entry.

                                    # # #

cc:       Michael R. Fuller, Esq.
          Robert J. Bocko, Esq.

Page 20 - MEMORANDUM OPINION

DISTRICT OF OREGON
**F I L E D**
November 14, 2012
Clerk, U.S. Bankruptcy Court

1
2
3   Below is an Opinion of the Court.
4
5
6
7
8
9                                    _Randall L. Dunn_
                                    RANDALL L. DUNN
                                    U.S. Bankruptcy Judge
10
11
12
13          UNITED STATES BANKRUPTCY COURT
14            FOR THE DISTRICT OF OREGON
15  In re                      )  Case No. 09-38599-rld7
16                             )
    David and Linda Culpepper, )  **ORDER HOLDING WELLS FARGO**
17                             )  **BANK, N.A. IN CONTEMPT OF**
                               )  **COURT**
18          Debtors.           )
    _____)
19
20        For the reasons stated in this Court's Memorandum Opinion of November 5, 2012,
21  (Docket No. 92), it is hereby:
22  / / /
23  / / /
24  / / /
25  / / /
26  / / /
27  / / /
28  / / /
    / / /
    / / /

**ORDER HOLDING WELLS FARGO BANK, N.A. IN CONTEMPT OF COURT** - Page 1

**ORDERED** that Wells Fargo Bank, N.A.'s motion for summary judgment (Docket No. 78) is denied and Debtors' motion for an order of contempt (Docket No. 32) is granted with an award of damages, attorney's fees, and costs to Mrs. Culpepper as stated in the Memorandum Opinion (Docket No. 92).

###

PRESENTED BY:

/s/ Michael Fuller
Michael Fuller, OSB #09357
Trial Attorney for Debtor
OlsenDaines, PC
9415 SE Stark St., Ste 207
Portland, Oregon 97216
(503) 201-4570

APPROVED BY:

/s/ Robert J. Bocko
Robert J. Bocko
Trial Attorney for Wells Fargo
Keesal, Young & Logan
1301 Fifth Avenue, Ste 1515
Seattle, Washington 98101
(206) 622-3790

All parties are ECF participants

**ORDER HOLDING WELLS FARGO BANK, N.A. IN CONTEMPT OF COURT** - Page 2